UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ARTHUR S. MOORE,                          )
                                          )
            Plaintiff,                    )
                                          )
      vs.                                 )      Case No. 4:14-CV-674-CEJ
                                          )
CAROLYN W. COLVIN, Acting                 )
Commissioner of Social Security,          )
                                          )
            Defendant.                    )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I.    Procedural History

On April 12, 2011, plaintiff Arthur S. Moore filed an application for disability
insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of
October 10, 2009.  (Tr. 120–21, 137)  After plaintiff's application was denied on
initial consideration (Tr. 60–63), he requested a hearing from an Administrative
Law Judge (ALJ).  (Tr. 64–65)  Plaintiff and counsel appeared for a hearing on
March 14, 2013.  (Tr. 28–49)  The ALJ issued a decision denying plaintiff's
application on March 28, 2013.  (Tr. 9–22)  Plaintiff requested the Appeals Council
reverse the ALJ's decision and remand for a new hearing.  (Tr. 6)  The Appeals
Council denied plaintiff's request for review on February 27, 2014.  (Tr. 1–4)
Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In a document dated April 13, 2011, plaintiff stated that he was married and had no dependents.  (Tr. 121)  He last worked on October 10, 2009, when he claims to have been fired "because of [his] condition."  (Tr. 121, 137)

In his Disability Report (Tr. 131–36), plaintiff listed his disabling conditions as gout, lower back pain, and high blood pressure.  (Tr. 132)  Plaintiff stated his gout "flares up at times," but admitted the condition "comes and goes."  (Tr. 136)  He reported taking only over-the-counter Advil for pain, and aspirin as a blood thinner.  (Tr. 134)  Plaintiff graduated from high school, where he never attended any special education classes; he did not allege any mental impairment.  (Tr. 132–33)  He can understand, read, and write English.  (Tr. 131)

Plaintiff worked as a housekeeper (*i.e.*, a custodian) at a hospital from 1974 until October 2009 (Tr. 133).  This was his only past relevant work experience.  As a housekeeper, his primary duties included stripping floors, disposing of refuse, making beds for patients, and setting up for meetings.  *Id.*  He used machines, tools, and various pieces of equipment to perform those duties.  *Id.*  On a typical day his job required him to walk or stand for up to six hours.  (Tr. 134)  He was also required to climb, crawl, crouch, kneel, and stoop.  *Id.*  The position also entailed lifting refuse bags weighing up to 20 pounds with some regularity, and plaintiff sometimes lifted "heavy boxes" weighing 100 pounds "or more."  *Id.*  In fact, he "frequently" lifted objects weighing up to 25 pounds.  *Id.*

In a Function Report (Tr. 145–52), plaintiff stated that he lived with his mother and other relatives.  (Tr. 145)  Plaintiff complained that his gout prevents

him from performing some activities, though he did not specify what he is unable to do.  (Tr. 145)

According to plaintiff, gout affects his hands, wrists, knees, and foot.  *Id.*  He additionally suffers from lower-lumbar back pain.  *Id.*  The pain disrupts his sleep and makes it challenging for plaintiff to dress, groom, or feed himself.  (Tr. 147)  Plaintiff also has difficulty getting up from a seated position if he sits for an extended period.  (Tr. 149)  Additionally, he claimed to be able to walk for only five or ten minutes at a time without needing to rest for "a while."  (Tr. 150)  Nevertheless, plaintiff reported being able to drive a car when his gout subsides.  (Tr. 148)  He also admitted going outdoors "all the time."  *Id.*  Though plaintiff claimed that he was prescribed crutches to ambulate (Tr. 151), he could not recall when they were prescribed, *id.*, and no medical records support that statement.  He also claimed to require a cane to ambulate every day.  *Id.*

In a Missouri Supplemental Questionnaire completed on May 3, 2011 (Tr. 153–56), plaintiff asserted that he had not sought medical treatment for his conditions because he lacks insurance.  (Tr. 155)  However, no records indicate that plaintiff ever sought to access free or reduced-price medical services for his conditions.  Plaintiff also reported taking Aleve for pain.  *Id.*

Finally, in a Disability Report Appeal filed on January 27, 2012, plaintiff recalled seeking treatment for "gout, high and low blood pressure, arthritis pain and swelling" in December of 2011.  (Tr. 158)  He reported taking four prescription medications for those conditions:  Allopurinol,[1] Carvedilol,[2] Colcrys,[3] and Norvasc.[4]

---

[1]**Error! Main Document Only.**"Allopurinol is used to treat gout, high levels of uric acid in the body caused by certain cancer medications, and kidney stones."
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682673.html (last visited Apr. 29, 2015).

(Tr. 159)  Plaintiff claimed to "suffer[] from pain and swelling[,] which limit all activities."  (Tr. 160)  He elaborated that he suffers from constant lower back pain, as well as knee pain and swelling.  (Tr. 159)  He claimed that his right hand swells to such a degree that it affects his grip, and it is "very painful for him to walk and stand."  (Tr. 160)

## B.  <u>Testimony at the Hearing</u>

Plaintiff and his attorney attended the administrative hearing on March 14, 2013. (Tr. 28-49)  Plaintiff was then 55 years old.  He testified that he was homeless and that he alternated between staying with his sister and his mother. Plaintiff was not working and that his only sources of income were "food stamps" and "a little retirement check."  (Tr. 31)  He admitted that he had applied for and received unemployment benefits after he was fired from his last job on October 10, 2009.  (Tr. 31–32)

Plaintiff testified that on a typical day he wakes up, takes his medication, drinks some water, and may make a sandwich for breakfast.  (Tr. 35–36)  He then calls relatives or friends for transportation.  *Id.*  Though plaintiff occasionally drives a car, he stated that he did not own a vehicle.  (Tr. 32)  According to plaintiff's testimony, much of his day is spent walking and taking breaks to sit down.  (Tr. 35) His travels include frequent visits to local parks.  (Tr. 36)  He returns to his

---

[2]**Error! Main Document Only.**Carvedilol is used to treat heart failure and high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697042.html (last visited Apr. 30, 2015).

[3]**Error! Main Document Only.**Colcrys is a prescription medicine used to "prevent and treat gout flares in adults."  http://www.fda.gov/downloads/Drugs/DrugSafety/UCM176363.pdf (last visited Apr. 30, 2015).

[4]**Error! Main Document Only.**Norvasc is indicated for the treatment of hypertension and coronary artery disease.  *See Phys. Desk Ref.* 2546 (61st ed. 2007).

mother's or sister's home in the early afternoon, eats a snack, and watches television. *Id.*

Plaintiff's sister shops for him and does his laundry. (Tr. 39, 40) His mother provides him dinner. (Tr. 37) He bathes infrequently because he has no fixed residence, but his impairments do not prevent him from bathing himself when he has the opportunity to do so. (Tr. 38) He typically goes to bed at 7:00 or 8:00 at night. *Id.*

Plaintiff complained of gout at the hearing. (Tr. 34) He testified to back and ankle pain so severe that he cannot work. The pain keeps him "up all the time" and interferes with his sleep, and his ankles sometimes swell. (Tr. 33) He allegedly cannot walk for more than two or three blocks without becoming winded, though he admitted that he has no medical condition that affects his breathing. (Tr. 40) He testified that he was unable to stand for more than fifteen to twenty minutes, depending on his pain level. *Id.* At the hearing he ambulated using a cane that had not been prescribed for him, but that he had purchased on his own. (Tr. 32)

Despite gout pain, plaintiff stated that he has no difficulty using his hands. (Tr. 40) In fact, plaintiff asserted that as a housekeeper he sometimes lifted up to 25 pounds, which conflicted with his assertions of greater strength in his disability application documents. (Tr. 33, 134) He also stated that he can stoop, kneel, crouch, and crawl; but it is difficult for him to return to a standing position if he does so. (Tr. 40)

Plaintiff also reported that he cannot sit for more than twenty or thirty minutes before he must stand up and walk around. (Tr. 41) He claimed to experience pain at night when he tries to sleep if he is not on medication. (Tr. 38)

Even without medication, plaintiff slept a total of eight hours a night; however, he sometimes woke up and watched television for several hours before returning to bed. (Tr. 39)

Plaintiff reported seeing a physician for his condition only every three to four months. (Tr. 34) In addition to taking Allopurinol for his gout (Tr. 34), plaintiff reported taking Gabapentin[5] (*i.e.*, Neurontin) daily for pain. (Tr. 44–45) He recalled that the medications he takes have not always been effective, but he could not describe specific instances in which the medications had been ineffective. (Tr. 34) Plaintiff was also unable to describe to what extent his medications alleviate his symptoms. (Tr. 38–39) Finally, plaintiff admitted that his pain is not constant; on certain days he experiences pain, while on others he feels "real good." (Tr. 44–45)

Michelle Peters-Pagella, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and past relevant work experience who retains the residual functional capacity (RFC) to perform medium work but is limited in the following ways: (1) the person cannot use ladders, ropes, or scaffolds, and must avoid all exposure to unprotected heights and (2) the person can only occasionally use ramps and stairs, kneel, crouch, or crawl. (Tr. 46) With those limitations, the vocational expert testified that such a person could still perform plaintiff's past relevant work as a housekeeper, which is medium work. *Id.*

---

[5] **Error! Main Document Only.**Gabapentin is used to help control seizures, to relieve the pain of postherpetic neuralgia, and restless leg syndrome. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited Apr. 29, 2015).

The vocational expert also testified that with that RFC such a person could work in other jobs that exist in significant numbers in the national economy. (Tr. 46–47) Peters-Pagella stated that examples of such jobs would include working as an assembler, a hand packager, or a sorter. *Id.* Plaintiff's counsel then asked the vocational expert if her opinion would change if the person were limited to only standing and walking for two hours out of an eight-hour workday. (Tr. 48) The vocational expert testified that such a person would not be able to work as a housekeeper or in any of the exemplar occupations the she had identified. *Id.*

### C. Medical Records

### 1. Pre-Application Records

Scant medical records exist from before plaintiff filed his application for benefits. On February 5, 2009, Dr. Richard Ihnat examined plaintiff. (Tr. 190) Dr. Ihnat diagnosed plaintiff with gout and prescribed Allopurinol for the condition, with orders to return for a follow-up visit in four months. *Id.* Plaintiff's uric acid level was tested on March 29, 2009; the results showed a uric acid level of 3.0, while the normal range is 3.5–8.5. (Tr. 197) Plaintiff was scheduled for a follow-up appointment with Dr. Ihnat on June 10, 2009, but he did not appear for that appointment. (Tr. 188)

On July 27, 2009, plaintiff was again examined by Dr. Ihnat. *Id.* During the examination, plaintiff reported pain in his right wrist and elbow. *Id.* Dr. Ihnat noted that plaintiff's right wrist was not tender. *Id.* Moreover, plaintiff's "urate levels [were] low enough that his flares shouldn't be gout," according to Dr. Ihnat. *Id.* The physician assessed plaintiff's arm pains as "tendonitis[,] since the urate

[level] was only 3." *Id.* Dr. Ihnat suggested that plaintiff use a prescription elbow brace for tennis elbow. *Id.*

Plaintiff reduced his weight from 190 pounds on February 5 to 185 pounds on July 27. *Id.* Dr. Ihnat recommended aerobic exercise for plaintiff's hypertension. (Tr. 189) Plaintiff was also given a handout recommending that he adopt a low-sodium diet, and he was told to return for a follow-up appointment in four months. (Tr. 186–87, 189) No records indicate he returned for a follow-up appointment.

## 2. Post-Application Records

On September 1, 2011, Dr. Alan Morris examined plaintiff. (Tr. 204) Plaintiff walked into the office for his examination with a cane held in his right hand; he was unassisted. (Tr. 205) He claimed to suffer from intermittent pain and swelling in both wrists and both knees. (Tr. 204) He estimated that his gout flares up once per week. *Id.* However, Dr. Morris reported that, "Despite the fact that he states that he has pain and swelling of the right wrist today, he demonstrates in the office that he uses the cane in his right hand and [when] getting out of the chair, he pushes down firmly on the cane with his right hand and arm." *Id.*

Plaintiff also complained of lower back pain in the mid-lumbar area, which he claimed was "constant" for the last year. *Id.* Despite that, plaintiff recalled taking Advil for pain only "occasionally" and having sought no treatment or evaluation for his alleged lower back condition. (Tr. 204–05) He also reported that he had not taken any prescription medications for at least a year before Dr. Morris examined him. (Tr. 205) Yet, he alleged that his pain was so great that he could only sit for twenty minutes, stand for twenty minutes, walk for ten minutes, and lift just eight

pounds. *Id.* Due to the alleged pain, he reported only sleeping between four and five hours per night. *Id.*

As the examination progressed, Dr. Morris asked plaintiff to walk fifty feet down a hallway to assess his gait. *Id.* Plaintiff held his cane in his right hand and walked ten feet down the hallway before he fell to the floor "with a soft landing on his right knee." *Id.* He was assisted to stand up, at which point he was unable to toe walk, heel walk, tandem gait, or squat. *Id.* He claimed to be unable to get on and off of the examination table. *Id.* After the examination concluded, plaintiff was observed walking without a cane out of the office for a distance of over fifty feet; he did not fall down. (Tr. 206) He was also observed walking unassisted out of the elevator on the main floor of the building where the examination occurred. *Id.*

Plaintiff was able to undress himself for the examination, but he claimed to need assistance dressing, which he received from the friend who brought him to the examination. (Tr. 205) Dr. Morris assessed plaintiff's grip strength and noted that his grip was a five out of five on his left hand and that, "[i]nitially, grip on the right hand was 4/5, but then [plaintiff] quickly loosened his grip to a 2/5." (Tr. 205–06) Plaintiff's range of motion was equal and within normal limits in both of his wrists, though plaintiff resisted movement and complained of pain in his right wrist. (Tr. 206) Dr. Morris noted no atrophy of either of plaintiff's hands. *Id.*

Dr. Morris concluded that plaintiff's clinical impressions include a "history of gout, although current uric acid level is even below [the] normal level." *Id.* In Dr. Morris's opinion, plaintiff's "physical examination [was] non-physiologic." (Tr. 207) Dr. Morris reported that in an eight-hour workday, plaintiff could stand or walk with normal breaks for at least two hours. (Tr. 208)

Dr. David Richards first examined plaintiff on December 20, 2011. (Tr. 231–44) Plaintiff complained of a history of gout, but, contrary to what he told Dr. Morris, he reported that his "last attack was over one year ago." (Tr. 240) Lab test results revealed plaintiff's uric acid level was 8.8. (Tr. 233) Dr. Richards concluded that plaintiff suffers from "benign essential hypertension" and "gout, unspecified." (Tr. 241) Upon discovering that plaintiff's kidney functions were normal, Dr. Richards instructed plaintiff to begin taking Colcrys daily, with a prescription for Allopurinol to begin three weeks after the date of the examination. Dr. Richards also prescribed Amlodipine Besylate (*i.e.*, Norvasc) and Carvedilol. (Tr. 239, 241)

Plaintiff was again examined by Dr. Richards on August 20, 2012. (Tr. 245) At that time, plaintiff reported "no gout flares" and "no ER visits" since his last examination eight months prior. *Id.* Yet, plaintiff complained of constant pain in both knees and ankles and in his right elbow and lower back. *Id.* Dr. Richards noted that plaintiff's elbows and knees were tender, and he was experiencing mild-to-moderate pain with motion of his elbows, knees, and feet. (Tr. 246) However, Dr. Richards observed no tophi[6] on plaintiff's body. *Id.* Dr. Richards prescribed Lisinopril[7] to manage plaintiff's high blood pressure. (Tr. 246) The physician concluded that it was "unlikely for gout to be [the] source of pain in all [of plaintiff's] painful joints." (Tr. 246–47)

On November 16, 2012, plaintiff was seen by Dr. Richards a third time. (Tr. 258) Dr. Richards noted that plaintiff was previously referred for an x-ray of his

---

[6]**Error! Main Document Only.**"Uric acid deposits called tophi develop in cartilage tissue, tendons, and soft tissues. These tophi usually develop only after a patient has suffered from [gout] for many years." http://www.nlm.nih.gov/medlineplus/ency/imagepages/19833.htm (last visited Apr. 30, 2015).

[7]**Error! Main Document Only.**Lisinopril is indicated for the treatment of hypertension. *See Phys. Desk Ref.* 2053 (61st ed. 2007).

spine, but his missed that appointment and never rescheduled. *Id.* Plaintiff was given a prescription for iron to treat anemia (Tr. 264), and Dr. Richards prescribed Losartan[8] potassium in place of Lisinopril to treat plaintiff's high blood pressure. (Tr. 260)  Follow-up x-rays were "all normal except for a very small amount of arthritis." (Tr. 265)

During the November 16 examination, plaintiff reported having not taken any of his prescribed medications since August 2012 because they had been thrown away by third parties when he moved accommodations. (Tr. 258)  Lab test results the next day revealed that plaintiff's uric acid level was 9.8. (Tr. 249)  Yet, despite that high acid level and not taking any medication for gout or his other conditions, plaintiff reported to Dr. Richards that he had experienced "no gout flares since [his] last visit [and] no ER visits." (Tr. 258)  Plaintiff was noted to have tenderness and pain in both knees and elbows. (Tr. 259)

Dr. Jesse Poblete performed a radiology consultation on plaintiff on December 19, 2012. (Tr. 272)  Dr. Poblete's examination found minimal degenerative joint disease of the right and left knees without evidence of fractures, dislocation, or other significant bony pathology. *Id.*  There were also minimal degenerative changes in the right and left ankles and elbows. (Tr. 273–76)

Dr. Richards examined plaintiff a final time on January 25, 2013. (Tr. 268)  The results of plaintiff's December x-rays "did not show any worrisome findings," according to Dr. Richards. *Id.*  Plaintiff was noted to again have refused a lower-spine x-ray. *Id.*  In addition, Dr. Richards noted that plaintiff "was sent a letter and

---

[8] **Error! Main Document Only.**"Losartan is used alone or in combination with other medications to treat high blood pressure."   http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695008.html (last visited Apr. 30, 2015).

told to come back to [the] lab 3 weeks after increasing Allopurinol to 200 mg, but he did not." *Id.* Plaintiff never filled his prescription for iron to treat anemia. *Id.*

### D. CDI Investigation

The Social Security Administration's Cooperative Disability Investigations Unit (CDI) conducted an inquiry regarding plaintiff's claims. The CDI investigative team observed plaintiff changing the oil on a car registered to him with no apparent difficulty. (Tr. 57, 213) He was observed walking with a normal gait until he saw the CDI team, at which point he began walking with a limp and moved his right hand to the lower right side of his back. (Tr. 57) Despite his claim that he is homeless, plaintiff was observed using a key to enter a residence. *Id.*

Upon questioning by the CDI team, plaintiff stated that he could not lift anything. *Id.* Just minutes earlier, however, he had been observed lifting a plastic bottle of oil while performing the oil change. *Id.* Plaintiff complained to the CDI team that he could not stand any longer, but he sat on the living room floor instead of on a nearby couch. *Id.* After resting on the floor for just twelve minutes, he stood back up and continued to walk around, never placing his hand on his lower back for support again. *Id.* As in his face-to-face interview with the Social Security Administration, plaintiff did not use a cane to ambulate while he was under surveillance by the CDI team. (Tr. 57, 129)

### III. The ALJ's Decision

In the decision issued on March 28, 2013, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2014.

2. Plaintiff has not engaged in substantial gainful activity since October 10, 2009, the alleged onset date.

3. Plaintiff has the following severe impairments: gout and obesity. Plaintiff has the following non-severe impairments: degenerative disk disease (*i.e.*, back pain), hypertension, joint arthralgias, anemia, and Hepatitis C.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) except that plaintiff: cannot climb ladders/ropes/scaffolds; must avoid all exposure to unprotected heights; can balance and stoop frequently; can occasionally climb ramps or stairs; and can occasionally crouch, kneel, and crawl.

6. Plaintiff is capable of performing past relevant work as a housekeeper. This work does not require the performance of work-related activities precluded by plaintiff's RFC.

7. Plaintiff was born on May 17, 1956 and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. He subsequently changed age categories to advanced age.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because plaintiff's past relevant work is unskilled.

10. Considering plaintiff's age, education, work experience, and RFC, there would be a significant number of other jobs in the national economy that plaintiff could perform.

11. Plaintiff has not been disabled within the meaning of the Social Security Act at any time from October 10, 2009 through the date of the ALJ's decision.

(Tr. 14–22).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to

support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant=s residual functioning capacity (>RFC=), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. ' 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must

make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether the claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.    Discussion

To be entitled to disability benefits under Title II, plaintiff has the burden of showing he was disabled prior to December 31, 2014, the date he was last insured. *Jenkins v. Colvin*, No. 2:12-CV-91-JAR, 2014 WL 1259771, at *2 (E.D. Mo. Mar. 26, 2014); *see also* 20 C.F.R. § 404.130; *Moore*, 572 F.3d at 522; *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). "Evidence from outside the insured period can be

used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'" *Cox*, 471 F.3d at 907 (quoting *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998). However, to be entitled to benefits, plaintiff must prove he was disabled before his insurance expired. *Id.*

Plaintiff presents two questions for review: (A) Did the ALJ err when she determined that plaintiff has the RFC to perform medium work? (B) Was the ALJ's hypothetical to the vocational expert improper, such that the vocational expert's opinion that plaintiff can return to his past relevant work did not constitute substantial evidence?

## A. Residual Functional Capacity

Plaintiff alleges that the ALJ committed three errors that undermine her determination that he has the RFC to perform medium work: (1) the ALJ improperly construed plaintiff's post-onset application for unemployment benefits as an admission that he has the capacity to work; (2) the ALJ erroneously interpreted plaintiff's ability to perform certain activities of daily living as indicative of his capacity to perform medium work; and (3) the ALJ failed to cite any medical or other evidence that would reasonably lead to the conclusion that plaintiff is capable of medium work.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence

that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### 1. <u>Unemployment Benefits</u>

Among the reasons the ALJ found plaintiff lacked credibility was his admission that he applied for and received unemployment benefits after October 10, 2009, the alleged onset date. (Tr. 18) "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Johnson v. Apfel*, 240 F.3d at 1148. "[T]he acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability." *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998). "A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work." *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991). "Because his application necessarily indicates that [plaintiff] was able to work, this may be some evidence, though not conclusive, to negate his claim that he was disabled . . . ." *Id.*

Without citing any support for the proposition, plaintiff alleges that in Missouri a person who applies for unemployment benefits only holds himself out as capable of performing some work, not full-time work. The ALJ therefore erred, in plaintiff's view, when she considered plaintiff's application for and receipt of unemployment benefits as indicative that he could work full time and accordingly found his claims less credible. Because plaintiff bears the burden to prove his disability, *Cox*, 495 F.3d at 619, he must support the assertions in his appeal of the Commissioner's decision. His failure to cite the Missouri law on which he relies undermines his argument.

Moreover, *Cox*, 160 F.3d at 1208, and *Jernigan*, 948 F.2d at 1074, plainly instruct that an ALJ is permitted to discount a claimant's credibility both when he applies for and when he receives unemployment benefits after his alleged onset date. Therefore, the ALJ did not err when she considered plaintiff's application for unemployment benefits as one indicator that his disability claim is not credible.

## 2. Daily Activities

The ALJ determined plaintiff's RFC in part based on his capacity to perform a "fair amount" of activities of daily living, including daily taking medications, preparing himself a sandwich, and visiting a park. (Tr. 18) The ALJ also noted that plaintiff was capable of performing all of those activities despite "very conservative" treatment for his alleged conditions (*e.g.*, no physical therapy, surgery, pain injections, or narcotic pain medication) and large gaps in treatment. *Id.*; *see Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996) (an ALJ may discount subjective complaints when the record as a whole reflects a history of infrequent medical treatment); *see also Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A

failure to follow a recommended course of treatment also weighs against a claimant's credibility."). According to plaintiff, the ALJ erred by failing to articulate how plaintiff's ability to regularly perform those activities reasonably leads to the conclusion that he is capable of performing medium work.

Plaintiff misreads the ALJ's analysis. In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit set forth factors an ALJ must consider in evaluating the credibility of a plaintiff's testimony and complaints, in addition to the objective medical evidence. These factors include:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore*, 572 F.3d at 524 (citing *Polaski*, 739 F.2d at 1322). Moreover, a claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. §§ 404.1529, 416.929; *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000); *Polaski*, 739 F.2d at 1322. Thus, while the extent of daily living activities does not alone show an ability to work, such activities may be considered along with other evidence when evaluating a claimant's credibility. *See Carlock v. Sullivan*, 902 F.2d 1342, 1343 (8th Cir. 1990); *see also McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (affirming an ALJ who appropriately considered claimant's activities of daily living); *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (same).

The ALJ never stated that her conclusion that plaintiff is capable of medium work was based solely on plaintiff's reported daily activities. Rather, as *Polaski* and its progeny require, his daily activities were properly considered with all other

factors. Thus, the ALJ did not err in considering plaintiff's admission that he daily takes medication, prepares a sandwich, and visits a park among her reasons for concluding that plaintiff retains the capacity to perform medium work.

### 3. <u>Medical and Other Evidence Supports the RFC</u>

Finally, plaintiff contends the ALJ failed to cite any medical or other evidence that reasonably leads to the conclusion that plaintiff has the RFC to perform medium work. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967. In his disability application plaintiff reported that in his past relevant work as a housekeeper required him to lift refuse bags weighing up to 20 pounds with some regularity, and he sometimes lifted "heavy boxes" weighing 100 pounds "or more." (Tr. 134) In fact, he "frequently" lifted objects weighing up to 25 pounds. *Id.* Thus, the record before the ALJ was uncontested that plaintiff had once been capable of performing, and he did perform, medium work. The ALJ then considered the existence and severity of plaintiff's symptoms to determine whether he was presently capable of such performance, ultimately concluding that plaintiff can still perform medium work. (Tr. 16–20)

To reach her conclusion that plaintiff can perform medium work, the ALJ first found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. 17) Plaintiff alleges no error with that determination. Second, however, in evaluating the intensity, persistence, and limiting effects of plaintiff's symptoms, the ALJ found that his symptoms were minor, such that he could still perform medium work. (Tr. 17–20) Plaintiff alleges

the ALJ erred in evaluating the severity of his symptoms, claiming the ALJ did not cite medical or other evidence that supports her conclusion.

As discussed above, in evaluating the severity of plaintiff's symptoms and making a credibility determination under the *Polaski* factors, the ALJ was obligated to consider the objective medical evidence as well as:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore*, 572 F.3d at 524 (citing *Polaski*, 739 F.2d at 1322); *see Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (explaining that a court is to "defer to the ALJ's evaluation of [a claimant's] credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth" (internal quotation marks and citation omitted)).

Contrary to plaintiff's assertion, the ALJ considered, *inter alia*, the following medical and other evidence to determine that plaintiff is capable of performing medium work:  Plaintiff was treated very conservatively for his conditions (*e.g.*, no physical therapy, surgery, pain injections, or narcotic pain medication).  X-rays of plaintiff's joints showed minimal degenerative changes.  Plaintiff was able to ambulate independently for over fifty feet after he left an examination, despite claiming to be unable to do so in that examination.  Plaintiff claimed to need a cane to ambulate, but it was not prescribed to him.  He intentionally loosened his grip during an examination to appear weaker than he is.  Plaintiff admitted that his gout flares up only once per week.  Examination reports show that gout was not the source of plaintiff's pain.  (Tr. 18–19)  The ALJ also noted that while plaintiff alleged

disabling back pain, "no treatment or image evidence in the record . . . indicates any back impairment." (Tr. 19)  Moreover, as discussed above, the ALJ cited other evidence—*i.e.*, plaintiff's application for unemployment benefits after his alleged onset date and his daily activities—to determine that plaintiff is capable of performing medium work.  (Tr. 18)  Thus, the ALJ cited substantial medical and other evidence to support her conclusion that while plaintiff's conditions cause his symptoms, he has the RFC to perform medium work.

Relatedly, plaintiff takes issue with the fact that in determining plaintiff's RFC, the ALJ accorded Dr. Morris's conclusion that plaintiff is only capable of performing sedentary work "little or no weight."  (Tr. 18)  Dr. Morris examined plaintiff (albeit only once) and he was thus a treating physician.  Generally, the Commission gives more weight to the opinion of a source who has examined a claimant than a source who has not.  20 C.F.R. § 419.927(c)(1).  When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight.  *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)).  An examining physician's opinion, however, neither inherently or automatically has controlling weight and "does not obviate the need to evaluate the record as a whole."  *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (internal quotations and citations omitted).

"An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Wildman v. Astrue*, 596 F.3d 959, 964

(8th Cir. 2010) (alteration in original) (internal quotation omitted).  Moreover, "[a]n ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical evidence."  *Rosa v. Astrue*, 708 F. Supp. 2d 941, 950 (E.D. Mo. 2010); *see also Davis v. Shalala*, 31 F.3d 753, 756 (8th Cir. 1994); *Loving v. Dep't Health & Human Serv.*, 16 F.3d 967, 971 (8th Cir. 1994).  An ALJ may not substitute his own opinions for the opinions of medical professionals.  *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Pate-Fires*, 564 F.3d at 946–47 (ALJs may not "play doctor").  However, an ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment."  *Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted).  Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion.  20 C.F.R. § 404.1527(c)(2).  But, of course, an ALJ is not required to discuss in detail every item of evidence.  *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).

As the ALJ explained, Dr. Morris's opinion, based on a single examination, that plaintiff is capable of performing only sedentary work is inconsistent with the medical and other evidence.  (Tr. 18); *see Goff*, 421 F.3d at 790–91 ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [an] opinion.").  The ALJ also noted that Dr. Morris's conclusion was entitled to "little or no weight" because the form on which he offered that opinion is skewed—it does not provide the physician with the option to select a medium exertional capacity.  *Id.*  Thus the ALJ properly discounted Dr. Morris's conclusion when determining plaintiff's RFC.

For the reasons just explained, moreover, and contrary to plaintiff's assertion, the ALJ did not rely solely on the opinion of a single decision maker, Angela Ross, to determine that plaintiff is capable of performing medium work. Rather, the ALJ cited substantial medical and other evidence to reach her conclusion. Substantial medical and other evidence supports the ALJ's conclusion that plaintiff is capable of performing medium work, so the ALJ did not err in determining plaintiff's RFC.

## B. Vocational Expert's Hypothetical

Plaintiff also contends that the ALJ presented the vocational expert with a hypothetical question that was improper in several respects, such that the expert's testimony regarding plaintiff's ability to return to his past relevant work did not constitute substantial evidence. "Testimony from a [vocational expert] based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996). As the Eighth Circuit has explained:

> A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ. The hypothetical question must capture the concrete consequences of the claimant's deficiencies. Likewise the ALJ may exclude any alleged impairments that she has properly rejected as untrue or unsubstantiated.

*Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (internal citations and quotations omitted); *see Heino v. Astrue*, 578 F.3d 873, 882 (8th Cir. 2009) ("[A] hypothetical question posed to a [vocational expert] need not include allegations that the ALJ found not credible." (citing *Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998)).

In his challenge to the hypothetical question and the expert's testimony, plaintiff contends (1) the ALJ made no explicit findings regarding the mental demands of plaintiff's past work and, thus, the hypothetical was incomplete; (2) the ALJ did not compare the demands of plaintiff's past relevant work to his current exertional limits to develop a proper hypothetical; and (3) the ALJ improperly determined that plaintiff could perform his past relevant work or other work in the national economy, even though the vocational expert testified that if plaintiff were limited to standing and walking for no more than two hours per day, as plaintiff asserts, then he would be precluded from such work.[9]

## 1. **Mental Demands**

Plaintiff first contends that the ALJ's failure to address his mental capacity in her hypothetical renders the vocational expert's testimony deficient. The plaintiff bears the burden to prove inability to perform past relevant work. *Pearsall*, 274 F.3d at 1217 (citing 42 U.S.C. § 423(a)(1)(D), (d)(1)(A)). Moreover, an ALJ is not required to "mechanically list and reject every possible limitation." *McCoy*, 648 F.3d at 615. Rather, "a hypothetical question posed to a [vocational expert] need not include allegations that the ALJ found not credible." *Heino*, 578 F.3d at 882 (citing *Pertuis*, 152 F.3d at 1006).

Plaintiff reported in his disability application that he graduated from high school, where he never attended any special education classes; he did not allege any mental impairment. (Tr. 132–33) The ALJ's decision notes that plaintiff did not assert any mental limitations and that there were no records of any such

---

[9]Because the ALJ correctly assessed the RFC, *see supra* Part V.A., the Court does not address plaintiff's argument that the vocational expert's responses are undermined by an incorrect RFC determination.

limitations. (Tr. 16) The ALJ was not required to discuss limitations plaintiff never alleged and that do not appear in any medical record when framing the hypothetical posed to the vocational expert. *See House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994) (observing that an ALJ is required to discuss only credible physical and mental impairments). Thus, the ALJ did not err in failing to include unalleged mental limitations in the hypothetical she posed to the vocational expert.

## 2. <u>Exertional Limits</u>

Second, plaintiff asserts that in framing the hypothetical, the ALJ failed to compare on a function-by-function basis plaintiff's present capabilities to the demands of his past relevant work as a housekeeper. The Court disagrees.

As discussed above, the ALJ took great care to explain plaintiff's purported limitations and her reasons for discounting many of them. (Tr. 16–20) To the extent that the ALJ found some of plaintiff's gout symptoms affect his capacity to work, she imposed limitations on his ability to perform medium work—*e.g.*, limiting him to climbing ramps and stairs occasionally—to account for those symptoms. (Tr. 19–20) And the ALJ incorporated those credible limitations into the hypothetical she posed to the vocational expert. *Id.*

The ALJ also described plaintiff's past relevant work as a housekeeper during the colloquy with the vocational expert and in her decision. (Tr. 20, 45–46) And both the ALJ and the vocational expert were aware of plaintiff's self-reported duties in that job and the duties and exertional limits of that position as it is typically performed. (Tr. 45–46); *see Wagner*, 499 F.3d at 853; *Barnett v. Barnhart*, 362 F.3d 1020, 1023 n.3 (8th Cir. 2004); *Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir.

1990).  Therefore, the ALJ's comparison of plaintiff's RFC to the "physical and mental demands of [his past] work" (Tr. 20), was sufficient.

Moreover, the ALJ alternatively inquired about other jobs available to someone of plaintiff's age, education, work experience, and RFC.  (Tr. 21)  The vocational expert testified that a person matching the ALJ's description could perform jobs as, *inter alia*, an assembler, a hand packager, and a sorter.  *Id.* Because the ALJ then found that plaintiff could return to his past position or work in one of those other positions, even if the ALJ's finding that plaintiff could resume work as a housekeeper was error, it is not reversible error.

### 3. <u>Walking and Standing</u>

Lastly, plaintiff contends that the ALJ erred when she found him capable of returning to his past work because the vocational expert opined that plaintiff would not be capable of working as a housekeeper if he were limited to standing and walking for no more than two hours per day.  (Tr. 48)  But the ALJ was only required to consider plaintiff's ability to work based on his credible limitations, not every limitation he or his counsel asserted.  *Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007) ("A hypothetical question . . . need only include impairments that are supported by the record and that the ALJ accepts as valid.");  *Lacroix*, 465 F.3d at 889;  *Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000);  *see also Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998) (observing that the ALJ's hypothetical may omit even non-severe impairments).

The ALJ found substantial evidence to suggest that plaintiff's allegation that he has difficulty walking was not credible—*e.g.*, he used a cane during an examination and was then seen walking normally without it when he thought he

was free from observation.  (Tr. 17–19)  In fact, no evidence was presented that plaintiff is limited to standing and walking for only two hours per day.  Only Dr. Morris opined that plaintiff has any limitation on standing and walking, which Dr. Morris assessed at "*at least* two hours total" per eight hour workday.  (Tr. 208) (emphasis added).  Even that assessment was given "little to no weight" because the form Dr. Morris used is skewed.  (Tr. 18)  Thus, the ALJ did not err in failing to address the non-credible limitation and the vocational expert's response to it.

## VI.   Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 19th day of August, 2015.